**GENERAL ELECTRIC COMPANY,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–172C.

United States Court of Federal Claims.

May 27, 2004.

Francis J. O'Toole, Washington, DC, for plaintiff. Howard Stanislawski, Mark P.

Guerrera, and Jonathan A. DeMella, Sidley Austin Brown & Wood LLP, and Brackett B. Denniston, III and Jerry Wald, General Electric Company, of counsel.

C. Coleman Bird, Washington, DC, with whom were Deputy Assistant Attorney General Stuart E. Schiffer, and Director David M. Cohen, for defendant. Elizabeth G. Candler and David D'Alessandris, of counsel. Stephen R. Dooley, Defense Contract Management Agency, of counsel.

## OPINION

FIRESTONE, Judge.

This matter comes before the court on the parties' cross-motions for partial summary judgment. In 1993, the plaintiff, General Electric Company ("GE"), sold to Martin Marietta Corporation ("MMC") GE's aerospace business units ("GE Aerospace"). These units provided airplane engines and related products and services to the government pursuant to various government contracts. Under the terms of the sale, several government contracts were transferred from GE to MMC (the "Transaction"). Prior to finalizing the Transaction with MMC, GE entered into an agreement with the government regarding the treatment of "costs" arising from the sale and transfer of GE Aerospace to MMC (the "Advance Agreement"). The pending motions concern the treatment of pension costs under the Advance Agreement. GE contends that the Advance Agreement addressed all issues associated with pension costs arising from GE's sale and transfer of contracts to MMC. The government contends that the Advance Agreement did not address all pension cost issues. For the reasons set forth below, the court **GRANTS** the government's September 29, 2003 cross-motion for partial summary judgment and therefore **DENIES** the plaintiff's November 7, 2003 cross-motion for partial summary judgment.

## BACKGROUND

The following facts are undisputed unless otherwise noted. On November 22, 1992, GE and MMC, now part of Lockheed Martin Corporation, entered into an agreement for

784

the sale to MMC of GE Aerospace (the "Transaction Agreement"). As part of the sale, certain GE employees were going to be transferred to MMC. In particular, GE was to transfer to MMC those GE employees who were actively employed by the transferred business on the day of closing (the "Active Employees"). As part of the Transaction, GE also planned to transfer the pension assets and liabilities associated with the Active Employees to MMC. Those persons associated with GE Aerospace who had already retired or were vested participants who left GE before the Transaction closed are herein referred to as "Inactive Employees." Pursuant to the Transaction Agreement, the pension assets and liabilities associated with the Inactive Employees remained with GE.

Because the Transaction included. the transfer of various government contracts, the government was involved in reviewing certain aspects of the sale, including the transfer of pension assets from GE to MMC in connection with the transferred Active Employees. Eventually, the government and GE entered into the Advance Agreement to address pension and other cost issues. Before turning to the terms of the government's Advance Agreement with GE concerning pension costs, the court will first review the rules governing pension costs in government contracting.

## A. Pension Costs Under CAS 413

The rules governing the accounting of pension costs are set forth in the Cost Accounting Standards ("CAS"), 48 C.F.R. pt. 9904 (1977).[1] In accordance with those rules, government contractors may elect among various options to account for their pension costs. These options give contractors a certain degree of flexibility in accounting for, and then charging pension costs to, government contracts. There are three options, namely composite accounting, segment accounting,

and hybrid accounting under CAS 413–50(c)(9). First, contractors may account for pension costs on a composite basis. *See* 48 C.F.R. § 9904.413–50(c)(1). Under the composite approach, the contractor may combine pension costs for more than one segment and may allocate pension costs among its segments in proportion to the amount of assets attributable to each segment. Second, the CAS mandates that certain contractors account for pension costs on a "segment" basis. *See* 48 C.F.R. § 9904.413–50(c)(2), (3). The CAS defines a "segment" as: "One of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service." 48 C.F.R. § 9904.413–30(a)(11). The third approach is the hybrid approach found in CAS 413–50(c)(9). Under this approach, contractors using segment accounting "may calculate [pension] cost either for all pension plan participants assignable to the segment(s) or for only the active participants of the segment(s)." 48 C.F.R § 9904.413–50(c)(9). If the contractor calculates pension cost for all pension plan participants, then pension cost for both the Active Employees and Inactive Employees will be calculated together. If the contractor elects to calculate costs for Active Employees only, CAS 413–50(c)(9) provides that the contractor must create a separate segment for the Inactive Employees. Under this approach, the "total annual pension cost for a segment having active lives shall be the amount calculated for the segment plus an *allocated portion of the pension cost calculated for the inactive participants ....*" 48 C.F.R. § 9904.413–50(c)(9) (emphasis added).

It is not disputed that GE has historically accounted, and still accounts, for its pension costs using the composite approach. The pension costs are calculated on the basis of various economic assumptions, including the

1. CAS 413 first went into effect in 1978. Cost Accounting Standards Board, 60 Fed.Reg. 16534 (March 30, 1995). The provisions of the CAS at issue have been amended since the inception of this litigation. Consequently, the provisions cited are not those of the most current version of the CAS, but rather those that were in effect at the time that the facts underlying this litigation

arose, and which are therefore applicable to this case. 48 C.F.R. § 9903.201–2(a) (CAS covered business units must "comply with all of the CAS ... that are in effect on the date of the contract award and with any CAS that become applicable because of later award of a CAS-covered contract.")

assumptions that the covered employees will be working with the contractor for their entire careers and that the amount invested will be sufficient to cover those employees based on the actuarial standards applied. Therefore, if an employee did not in fact work for GE for his entire career, the amount that the government may have contributed toward GE's pension plan to cover that employee might exceed the amount of GE's pension liability for that individual. Similarly, if the value of the pension fund, which is invested by GE, exceeds or fails to meet the investment assumptions built into the pension cost model, the pension fund can become over- or under-funded.[2] It is therefore possible, based on the success of the contractor's investment strategy, that the government may have over-contributed or under-contributed to a contractor's pension fund.

CAS 413 not only establishes the rules that govern how contractors should account for pension costs, but also provides for an eventual settling-up of pension costs between contractors and the government when a segment belonging to the contractor ceases to engage in government contracting. The precise way in which CAS 413 dictates this process represents a large portion of the dispute before the court today.

The settling-up of pension costs after a segment ceases to perform government contracting is governed by CAS 413–50(c)(12). CAS 413–50(c)(12) provides, in relevant part, as follows:

> If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated .... In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph (c)(5)(i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment's proportionate share of the total market value of the assets of the pension fund .... The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

48 C.F.R. § 9904.413–50(c)(12).

It is not disputed that the sale of GE's units to MMC resulted in a segment closing for GE. The government argues that in such circumstances, GE must comply with CAS 413–50(c)(12) and determine whether the government over- or under-contributed to the portion of GE's pension plan attributable to the government work performed by the businesses it sold to MMC. Recognizing that GE has already transferred a portion of the segment's pension fund to MMC for Active Employees, the government, in this litigation, seeks a resolution of pension costs with regard to the Inactive Employees who remain the responsibility of GE.

GE responds that the Transaction with MMC provided for the creation of a separate Active Employees-only "segment." Thus, the only segment that "closed" did not include any Inactive Employees. According to GE, the Advance Agreement provided for a complete resolution of all pension issues associated with the Transaction and thus there is no basis for "settling-up" the pension liabilities of the Inactive Employees who will remain GE's responsibility.

## B. The Advance Agreement

During 1992 and 1993, while GE was negotiating the Transaction Agreement with

---

**2.** In fact, during the period at issue, the value of GE's pension fund was significantly greater than the liability that GE owed to its potential pensioners. As of December 31, 1992, the GE Pension Plan was over-funded by $26,466,211. This situation, called over-funding, became a widespread phenomenon during the early 1980s due primarily to "the unexpectedly robust growth of the stock market, and to a lesser extent from the shrinking defense industry workforce, dampened wage inflation for salaried employees below the corporate executive level, funding requirements imposed by the Employee Retirement Income Security Act (ERISA) of 1974, and government contract regulations." Karen L. Manos, *Government Claims to Surplus Pension Assets*, 48 Cath. U.L.Rev. 1139 (1999).

MMC,[3] it was also negotiating the Advance Agreement with the government.[4] The government's chief negotiators were Kenneth Cavoli from the Defense Logistics Agency ("DLA"), now known as the Defense Contract Management Agency ("DCMA"), who was the on-site Contracting Officer ("CO") for GE, and Donald Batterby, the DLA's Contract Specialist. In addition, the government had auditors, accountants, contract specialists, and lawyers review the Advance Agreement before it was signed on September 29, 1993. GE's main negotiators were Lynn Saylor, then GE Director of Corporate Government Finance, and Samuel Hand, currently GE Manager of Corporate Government Finance.

The purpose of the Advance Agreement was to "reach understandings between GE and the Government, thereby avoiding subsequent disputes, including those over costs arising" from the GE–MMC Transaction. Advance Agreement, ¶ II.D. With respect to pension costs, the government and GE agreed to the following language on pensions in the Advance Agreement:

1. GE pension assets will be transferred to a trust designated by MMC to fulfill obligations to employees transferred with the Business. The amount of pension assets to be transferred was estimated in the Transaction Agreement dated November 22, 1992 to be $1,650,000,000 but a final figure will depend upon the GE employees actually transferred to MMC. Subsequent to the Effective Date and once transferred, the pension assets and related employee liabilities will become the responsibility of the designated MMC plan.

2. The transfer of GE pension assets to MMC is intended to cover transferred employees. GE retirees, including those employees who retire or terminate prior to April 4, 1993, are not considered transferred employees. GE will retain the pension liability for any GE employees that retire or terminate prior to April 4, 1993.

Advance Agreement, ¶ IV.H.

The parties' dispute revolves around the meaning of the language of this provision. The parties attribute different meanings to its terms. GE claims that the Advance Agreement was intended to satisfy all of GE's obligations under CAS 413, including the segment closing provisions of CAS 413–50(c)(12). Therefore, GE contends that, after the Transaction, the government has no right to seek any further settling-up with GE for pension assets associated with the Inactive Employees associated with the business units sold in the Transaction.

The government, to the contrary, contends that the Advance Agreement, through this pension provision, addressed only GE's transfer of pension assets to MMC. The government argues that the Advance Agreement did not address or resolve GE's obligations under CAS 413–50(c)(12) with regard to the Inactive Employees who were associated with the units sold to MMC.

It is not disputed that in a preliminary draft of the Advance Agreement there was a sentence which read: "The transfer of pension assets is compliant with current and applicable provisions of . . . CAS." Although this phrase was deleted before the final Advance Agreement was signed, the parties

3. The Transaction Agreement signed between GE and MMC included a section on pensions which effected a transfer of the pension assets associated with the Active Employees to MMC upon the sale of GE Aerospace. The pension section of the Transaction Agreement included a formula for determining how much in pension assets would be transferred to cover the Active Employees. The pension section also included an estimate of how much would be transferred, based on the projected assets associated with the Active Employees at the time of the Transaction. The estimated amount of assets to be transferred to account for the Active Employees was $1.65 billion. The estimate was adjusted to a final figure in accordance with the formula set out in the Transaction Agreement after the Transaction closed in April 1993. The amount actually transferred was about $1.17 billion, or $480 million less than the amount estimated in the Transaction Agreement. GE transferred assets, liabilities and surplus related only to Active Employees to MMC.

4. Advance Agreements are encouraged by the Federal Acquisition Regulations. 48 C.F.R. § 31.109 (2004).

agree that deletion of this phrase was not intended to imply that the Advance Agreement did not comply with current and applicable provisions of the CAS. The parties also agree that the Advance Agreement neither mentions CAS 413 nor makes any mention of a future settling-up by the parties under CAS 413–50(c)(12).

Although the Advance Agreement does not mention CAS 413–50(c)(12) or segment closing, GE contends that the facts surrounding the Advance Agreement demonstrate that the parties intended to resolve all pension cost issues associated with the Transferred Employees as part of the Advance Agreement. GE notes that the government does not dispute that Robert Yesner, a Department of Defense official with CAS expertise, reviewed the pension section of the Advance Agreement at the request of Mr. Cavoli before the government agreed to its terms. GE contends that the purpose of Mr. Yesner's review was to ensure compliance with CAS 413. The government argues in response that the purpose of Mr. Yesner's review was only to ensure that GE would be transferring an appropriate amount of pension assets for the Active Employees. The government claims that Mr. Yesner's approval of GE's proposed transfer of pension assets for Active Employees has no bearing on GE's remaining obligations under CAS 413–50(c)(12) with regard to the Inactive Employees associated with the units sold to MMC.

The government acknowledges that Mr. Hand told Mr. Yesner sometime in 1993 that, to the extent the sale to MMC amounted to a segment closing, the Transaction amounted to a segment closing of Active Employees only. Thus, GE contends that implicit in the Advance Agreement was the understanding that GE was closing an "Active Employees-only segment" and transferring the pension assets and liabilities associated with that segment to MMC. According to GE, the government, therefore, must have understood that no further segment closing calculation would be required.

The parties do not agree as to Mr. Yesner's reaction to GE's position. GE asserts that Mr. Yesner agreed with Mr. Hand that the Transaction was indeed an Active Em-

ployees-only segment closing under CAS 413 and consequently that there would be no final settling-up of Inactive Employees associated with the units sold to MMC. The government claims that Mr. Yesner did not agree with Mr. Hand.

GE also maintains that Messrs. Batterby and Cavoli, as well as members of the DLA, also implicitly understood that, should the Transaction be deemed a segment closing, then the Advance Agreement would satisfy all of the segment closing requirements of CAS 413–50(c)(12). In particular, GE contends that government officials understood that, once the units were sold to MMC, GE could continue to charge costs for the Inactive Employees associated with the units to the government on a composite basis. GE explains that if the sale to MMC triggered a segment closing with respect to the Inactive Employees, then GE would not have been authorized to charge pension costs for these employees in its ongoing government contracts.

The government admits that it understood that, after the Transaction, GE could no longer charge pension costs for the Active Employees to the government. In addition, the government concedes that it understood that GE could continue to charge pension costs for the Inactive Employees to the government. The government contends, however, that this does not mean that the government had agreed to an Active Employees-only segment closing. The government asserts that the Advance Agreement did not address or finally resolve GE's segment closing obligations with regard to Inactive Employees; thus, GE would have been able to charge costs for the Inactive Employees until the segment closing issue was finally resolved.

In 1995, after the Advance Agreement had been signed and after the Transaction had taken place, the government met with GE to discuss pension issues. At a September 8, 1995 meeting, the government asked GE for a segment closing calculation under CAS 413–50(c)(12). The parties agree that, during that meeting, the current dispute became apparent: the government did not consider the Transaction to have fulfilled all of the

segment closing requirements of CAS 413; GE, on the contrary, believed that it had fulfilled all of its obligations under CAS 413.

On November 21, 1995, the government, through the Defense Contract Audit Agency ("DCAA"), issued a draft DCAA Audit Report ("Draft Audit Report") to GE, in which it recommended that, to be in compliance with CAS, GE needed to submit a segment closing calculation for the Inactive Employees. In advance of issuing the Draft Audit Report, the government debated its position among its various offices. GE relies on statements from an internal September 1995 government memorandum, which was part of that internal debate, from Patrick Ring, Senior Actuary for the DCMA, to Mr. Cavoli. The September 1995 memo stated:

> The issue regarding inactive liability is breaking new ground. The government has not pursued this issue in the past. As you know, we mentioned it to GE at our last meeting and they were emphatic that creating a segment of only active participants for segment closing purposes was in compliance with CAS. I disagree. However, there is not yet a consensus among the government "experts" on this issue.

Memorandum from Ring to Cavoli of 9/29/1995.

Apparently, the government also believed that the 1995 CAS amendments applied to the Transaction and had debated attempting to retroactively apply the new CAS to segment closings that occurred prior to its effective date. Eventually, the government concluded that the original CAS also required GE to include the Inactive Employees in a segment closing calculation.

The government formally notified GE of its noncompliance with CAS 413 on September 16, 1996. On September 19, 1996, there was a meeting between GE and the government regarding pension issues. GE's September 19, 1996 talking points, circulated at the meeting, expressed GE's uncertainty as to which CAS provision even applied to the Transaction.[5]

On December 13, 1996, GE responded to the government's Initial Finding of Non-Compliance. In its response, GE argued that "No segment closings occurred," that "GE treated inactive [pension plan] participants properly" and that "DCAA Ignores The Fact That The Aerospace Business Transferred To Martin Was a New Segment." GE's Response to Initial Finding of Noncompliance of 12/13/1996. GE said that "both logic and a reasonable reading of the regulations support GE's contention" and that the segment should be defined by what was sold and transferred, not by what was neither sold nor transferred (i.e. Inactive Employees). *Id.*

In January of 1997, GE sent an addendum to its December 13, 1996 submission to the government, taking the position that the Advance Agreement itself indicated that the parties expressly agreed to exclude Inactive Employees from the segment closing calculation. The government contends that this is the first time that GE raised the Advance Agreement as the basis for excluding the Inactive Employees from any segment closing calculation that may be required. GE claims that it made this position clear to the government, although not in writing, numerous times during and after the September 8, 1995 meeting.

Between 1995 and 1998 the parties engaged in negotiations, during which time GE submitted a claim to the CO for an adjustment in the amount of $539.2 million plus interest for post-retirement pension costs which GE claims represents the amount of post-retirement pension costs to which it claims that it is entitled if it must perform a segment closing with respect to the Inactive Employees associated with the Transaction.

On February 24, 1999, the CO issued a Final Decision asserting a government claim for $530.7 million plus interest against GE. The government's claim is based on its CAS 413–50(c)(12) calculation and represents the amount that GE's pension plan is "over-funded" for the Inactive Employees for whom GE retained pension liability following the Transaction with MMC.

---

**5.** As discussed at length, *infra,* GE also contends that its position regarding the creation and clos-

ing of an Active Employees-only segment is supported by CAS 413–50(c)(9).

## C. The Pending Motions

GE filed the present action challenging the government's claim for pension costs under CAS 413–50(c)(12) and claiming payment of $539.2 million plus interest for pension costs and post-retirement medical benefit costs in connection with the pension liabilities it retained following the Transaction. With respect to the government's counterclaim for $530.7 million plus interest in pension surplus associated with the Inactive Employees, GE answered that the plain language of the Agreement indicates that the parties agreed that GE had fully satisfied its obligations under CAS 413 by transferring pension assets for Active Employees-only pursuant to the Transaction Agreement. While the present action was pending, the court, in a companion case, determined, among other things, that the sale of a segment constitutes a segment closing and thus a CAS 413–50(c)(12) segment closing calculation is required following the sale of a "segment" as defined under the CAS. *Teledyne v. United States,* 50 Fed.Cl. 155, 170 (2001), *aff'd,* 316 F.3d 1366 (Fed.Cir.2003), *cert. denied,* — U.S. —, 124 S.Ct. 804, 157 L.Ed.2d 732 (2003).

It is against this backdrop that the parties filed the present cross-motions for partial summary judgment pursuant to Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"). GE contends that the Transaction amounted to an Active Employees-only segment closing and thus no further settling-up for Inactive Employees associated with the units sold to MMC is required by CAS 413–50(c)(12). GE argues that the pension surplus attributable to Inactive Employees should properly remain in GE's pension fund where it can be used to offset pension charges on the government contracts performed by other GE business units. GE further contends that the government concurred in its understanding of its CAS obligations in the Advance Agreement and should therefore be estopped from changing its position at this later date.

The government responds that CAS 413 does not provide for an Active Employees-only segment closing and that the Advance Agreement did not resolve any issues regarding GE's compliance with CAS 413. The government further contends that estoppel should not be applied in this case.

After briefing, oral argument was held on May 6, 2004.

## DISCUSSION

### A. Standard of Review

This court is required to enter summary judgment for a party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Unidynamics Corp. v. Automatic Prod. Int'l.,* 157 F.3d 1311, 1316 (Fed.Cir.1998); *Adarbe v. United States,* 58 Fed.Cl. 707, 714 (2003). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. A fact is material "if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment." *J. Cooper & Assoc., Inc. v. United States,* 53 Fed.Cl. 8, 14 (2002) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505). "In deciding whether a genuine issue of material fact exists, the evidence must be viewed in the light most favorable to the nonmoving party with doubts resolved in its favor." *Unidynamics,* 157 F.3d at 1316.

In this case, both parties have moved for summary judgment and allege an absence of genuine issues of material fact. In such a case, "the court is not relieved of its responsibility to determine the appropriateness of summary disposition." *J. Cooper & Assoc.,* 53 Fed.Cl. at 15. Rather, the court evaluates each motion on its own merits, applying the same standard for summary judgment to each motion. Simply because each party asserts a contradictory claim, it does not follow that "if one is rejected the other necessarily is justified." *Id.*

It is proper on a motion for summary judgment for this court to engage in contract interpretation. *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1479–80 (Fed.Cir. 1997); *Adarbe,* 58 Fed.Cl. at 714. Even when the interpretation involves resolving some ambiguity in the contract language, this court may properly resolve this ambiguity as a matter of law on a motion for summary judgment. *Barseback Kraft,* 121 F.3d at 1480. Consequently, the court is authorized to interpret the pension provisions of the Advance Agreement as a matter of law. Similarly, it is also proper for this court to engage in regulatory interpretation on a motion for summary judgment. *Neptune v. United States,* 38 Fed.Cl. 510, 513 (1997); *see Hill v. United States,* 945 F.2d 1529, 1530 (Fed.Cir.1991), *rev'd on other grounds,* 506 U.S. 546, 113 S.Ct. 941, 122 L.Ed.2d 330 (1993). Consequently, to the extent that the court must interpret CAS 413 for the disposition of this case, it is authorized to do so as a matter of law on the parties' cross-motions for summary judgment.

## B. Positions of the Parties

As noted above, at the heart of this dispute is the parties' differing readings of the language of the Advance Agreement with respect to pension costs. GE contends that the language of the Advance Agreement plainly states that as long as GE complies with the transfer of assets pursuant to the Advance Agreement, GE will have fulfilled its obligation to settle-up with the government under CAS 413–50(c)(12). Although the pension provisions of the Advance Agreement do not contain a specific reference to CAS 413–50(c)(12), GE relies on the reference to "employees transferred with the business" to support its position. GE claims that this reference confirms its view that GE accomplished an Active Employees-only segment sale or closing for purposes of CAS 413–50(c)(12). GE goes on to argue that the Advance Agreement's silence on the issue of a future settling-up with regard to Inactive Employees further demonstrates that no such settling-up was contemplated by the parties. Thus, GE argues, once the pension assets were transferred from GE to MMC, as specified by the Advance Agreement, all of GE's obligations under CAS 413–50(c)(12) were extinguished.

GE argues that the failure of the Advance Agreement to mention CAS 413–50(c)(12) is not relevant. According to GE, the only reason that the government was concerned with GE's transfer of pension assets to MMC was to ensure compliance with CAS 413–50(c)(12). If GE did not transfer the pension assets in compliance with the CAS, then it would have failed to bring about the one thing that the Advance Agreement intended to do, which is resolve all of its pension liability in connection with the Transaction.

Finally, GE argues that its reading of the Advance Agreement is consistent with CAS 413–50(c)(9). According to GE, CAS 413–50(c)(9) allows for the creation of "Active Employees-only segments" and therefore it allows for the closing of these "Active Employees-only segments." GE argues that although it uses the composite accounting method and does not use CAS 413–50(c)(9) to account for pension costs, it still had the right to create an "Active Employees-only segment" for purposes of pension accounting. GE suggests that if this right is not vindicated, companies using different accounting methods will be subject to different accounting rules in contravention of the CAS.[6]

The government contends, in response to GE, that it is plain from the language of the Advance Agreement that it did not resolve all of GE's segment closing obligations under CAS 413–50(c)(12). First the government notes that the Advance Agreement does not mention CAS 413–50(c)(12). Similarly the government notes that the Advance Agreement does not use the words "segment" or "segment closing" and does not purport to provide a final settling-up of all pension

---

6. Composite accounting, like segment-by-segment account, still utilizes segments. When a contractor accounts for costs using composite accounting, upon the closing of a segment it must determine the difference between the actuarial liability of the segment and the market value of the assets allocated to that segment. The contractor must then allocate a proportionate share of the value of the assets of the entire pension fund to the liability associated with the closed segment. 48 C.F.R. § 9904.413–50(c)(12).

costs. In the absence of any specific language regarding CAS 413–50(c)(12) or a segment closing, the government argues that the Advance Agreement simply did not address GE's obligations under CAS 413. Instead, the government argues, the Advance Agreement simply provided for an allocation of pension assets between GE and MMC for the transferred employees. GE's segment closing obligations under CAS 413 with respect to Inactive Employees were not dealt with in the Advance Agreement.

The government also argues that GE's reading of the Advance Agreement does not comport with the CAS. The government argues that CAS 413–50(c)(12) mandates an accounting of pension costs for both Active Employees and Inactive Employees associated with a closed segment. In particular, companies that use composite accounting, like GE, are required to allocate pension costs to the segment that was closed and then determine the amount of the government's over– or under-contribution to GE's pension fund in connection with the closed segment.

The government argues that GE's reliance on CAS 413–50(c)(9) to suggest that contractors can create Active Employees-only segments is misplaced. The government argues that CAS 413–50(c)(9) cannot be applied by analogy to the present situation. Moreover, the government contends that companies using CAS 413–50(c)(9) must also account for both Active Employees and Inactive Employees in any eventual segment closing. In support of its reading of CAS 413–50(c)(9), the government relies on the deposition of Ms. Frances Cornett, the Chief of Accounting and Cost Principles Division, DCAA. She explained that while CAS 413–50(c)(9) allows for contractors that use segment accounting to account for pension costs based on Active Employees-only and Inactive Employees-only segments, CAS 413–50(c)(12) operates to ensure that upon a segment closing, the contributions allocable to the Active Employees segment for Inactive Employees will be included in a final settling-up of the segment.

The arguments of the parties will be addressed in turn.

## C. The Government's Reading of the Advance Agreement Is Reasonable

■ The plain language of a contract is necessarily the starting point, and very often is the finishing point, of a court's duty to interpret a contract. In a contract dispute, the court must "look to the language of the contract to resolve it." *Textron Def. Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998). Furthermore, it is indisputable that "[w]hen the contract language is unambiguous, the court's inquiry is at an end, and the plain language of the contract is controlling." *Johnson Controls World Serv., Inc. v. United States,* 48 Fed.Cl. 479, 492 (2001). *See Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1375 (Fed.Cir.2004) (holding that "[i]f the terms of a contract are clear and unambiguous, they must be given their plain meaning-extrinsic evidence is inadmissible to interpret them."); *HRE Inc. v. United States,* 142 F.3d 1274, 1276 (Fed.Cir.1998) (holding that it is a "well-settled rule that when the provisions of a contract are clear, the court may not resort to extrinsic evidence to interpret them.") (internal citation omitted).

■ Whether a contract is clear is a question of law which the court determines by looking at the "plain meaning of its express terms." *Barron Bancshares,* 366 F.3d at 1375. *King Fisher v. United States,* 51 Fed. Cl. 94, 99 (2001). Whether the contract language is clear, in turn, is defined by its opposite: that is, a contract provision is clear if it is not ambiguous. Consequently, if there is no ambiguity in the language of the contract, then the contract is clear and the court's inquiry is at an end.

■ A provision of a contract is "only ambiguous if susceptible to more than one reasonable meaning." *Barron Bancshares,* 366 F.3d at 1375–76. "To show an ambiguity, it is not enough that the parties differ in their respective interpretations of a contract term; rather, both interpretations must fall within a zone of reasonableness." *King Fisher,* 51 Fed.Cl. at 99 (internal citation omitted). Even when the contract is not a "model of clarity" and even if the government would be "well advised to review its

provisions to make them more comprehensible," the language can still be plain enough for the court to decline to examine extrinsic evidence. *HRE*, 142 F.3d at 1276. Tested by these standards, the court finds that the government's reading of the plain language of the Advance Agreement is reasonable.

■ As noted above, the Advance Agreement, by its terms, requires that:

1. GE pension assets will be transferred ... to fulfill obligations to employees transferred with the Business .... Subsequent to the Effective Date and once transferred, the pension assets and related employee liabilities will become the responsibility of the designated MMC plan.

2. The transfer of GE pension assets to MMC is intended to cover transferred employees .... GE will retain the pension liability for any GE employees that retire or terminate prior to April 4, 1993.

Advance Agreement, ¶ IV.H.

The Advance Agreement does not mention CAS 413–50(c)(12) and does not use the words "segment" or "segment closing." Rather, it is clear from a plain reading of the first sentence of ¶ IV.H.1 of the Advance Agreement that GE will be transferring pension assets to MMC sufficient to account for the pension liabilities associated with the Active Employees joining MMC. Without question, the government had an interest in ensuring that MMC received sufficient pension resources to meet the needs of the Active Employees, so that the government would not have to contribute more than necessary to MMC's pension plan to cover these Active Employees. The Advance Agreement also prevented GE from transferring too large an amount of its pension fund to MMC. Just as the government had an interest in ensuring that MMC had sufficient pension assets for the transferred employees, the government also had an interest in ensuring that GE retained sufficient pension assets for the pension obligations it did not transfer in the Transaction.

GE makes much of the fact that government employees stated that they understood that GE would be able to charge pension costs for the Inactive Employees to the government following the Transaction. GE contends that this amounts to a concession by the government of GE's reading of the Advance Agreement. In particular, GE argues that "[t]he government would not and could not have agreed that GE could charge future pension costs for inactives associated with the transferred segment if there was also to be a settling-up for those inactives as part of a segment closing." Pl.'s Resp. to Def. Cross-motion and Reply ("GE's Reply") at 5.

The government responds that its statements on this issue are not inconsistent with its position in this case, because until such time as GE finally settled-up with the government, GE could continue to charge costs to the government.[7] The government contends that the contemporaneous views of Messrs. Cavoli and Batterby, the government's negotiators, regarding GE's ability to charge costs for Inactive Employees, support the government's view that the government did not consider the Advance Agreement to be a final segment closing determination.

Based on the plain words of the Advance Agreement, the government's contention that the Advance Agreement was not intended to address GE's segment closing obligations under CAS 413–50(c)(12) is well supported. As the government notes, the Advance Agreement does not refer to CAS 413–50(c)(12) or to any other provision of CAS 413. Indeed, as the government also notes, the Advance Agreement does not use the words "segment" or "segment closing." Finally, the Advance Agreement does not indicate in any way that it constitutes the final settling-up for pension costs as required by CAS 413–50(c)(12). In such circumstances, the government reasonably concludes that the Advance Agreement did not finally resolve GE's obligations under CAS 413.

■ Because the government's reading of the Advance Agreement is reasonable, the

---

7. As a practical matter, because GE's pension fund was over-funded, it was not charging pension costs to the government.

court will only find an ambiguity if GE's interpretation of the Advance Agreement is also supported and reasonable. *See King Fisher*, 51 Fed.Cl. at 99. In this connection, whether the reading is reasonable is an objective rather than a subjective determination. As the Federal Circuit has noted, "expectancy does not establish entitlement." *Textron*, 143 F.3d. at 1468. The plaintiff's subjective understanding of the contract will not control if in conflict with the plain language of a provision. *Id.* at 1468–69.

### D. GE's Reading of the Advance Agreement Section is Not Reasonable

It is not disputed that the Advance Agreement does not mention the specific subject that the plaintiff claims it addresses, namely GE's obligations under CAS 413–50(c)(12). GE concedes that nothing in the language of the Advance Agreement purports to state that the Advance Agreement served as a final segment closing calculation under CAS 413–50(c)(12). Indeed, there is nothing in the language of the Advance Agreement to suggest that the sale to MMC was recognized as a segment closing by the parties. Absent express language to suggest that the Advance Agreement fully and finally resolved GE's obligations under CAS 413, there is no basis for the court to reasonably conclude, based on the plain language of the Advance Agreement, that the Advance Agreement provided for a final segment closing accounting for the sale of the business units to MMC.

GE's contention that the pension provisions in the Advance Agreement would be meaningless if the provisions did not resolve GE's obligations under CAS 413–50(c)(12) is without merit. The court agrees with the government that the Advance Agreement's pension provisions served the very important purpose of ensuring that the government did not assume unnecessary pension costs for contracts transferred to MMC. It also ensured that GE retained sufficient pension assets to cover GE's remaining pension obligations to those employees that were not transferred in the Transaction. The government certainly did not want GE's pension plan to become under-funded. Thus, contrary to GE's contentions, the Advance Agreement addressed significant pension cost issues without fully and finally resolving GE's liability under CAS 413–50(c)(12).

In sum, the court finds that GE's reading of the Advance Agreement is not supported by the plain words of the agreement. GE's contention that the Advance Agreement "expressly" provided for and approved of a final segment closing for an "Actives-only segment" under CAS 413, is simply unfounded. As discussed below, GE's interpretation of the Advance Agreement is also not compelled by the CAS itself. Contrary to GE's contentions the CAS does not recognize the type of Actives-only segment closing advanced by GE.

### E. GE's Interpretation is Also Not Consistent with CAS 413

For the reasons that follow, the court finds that GE's interpretation of the Advance Agreement is not reasonable on the grounds that it is not consistent with CAS 413. *See Int'l Transducer Corp. v. United States*, 30 Fed.Cl. 522, 530 (1994) (holding that a party's interpretation of a contract provision is not reasonable if it requires what is forbidden by regulation).

The government contends that GE must account for the pension costs associated with the Inactive Employees it retained as part of a CAS 413–50(c)(12) segment closing following the sale of GE's units to MMC. The government contends that, under CAS 413–50(c)(12), contractors like GE, that use composite accounting, must undertake a CAS 413–50(c)(5) calculation. CAS 413–50(c)(5) states, in relevant part, that "the amount of assets to be allocated to the segment shall be the amount of funds contributed by, or on behalf of, the segment, increased by income received on such funds, and decreased by benefits and expenses paid from such funds ...." 48 C.F.R. § 9904.413–50(c)(5). The government argues that CAS 413–50(c)(5) mandates that GE calculate the government's entire pension contribution on behalf of the units sold to MMC, for both the Active Employees and Inactive Employees associated with those units. Once that calculation is performed, 413–50(c)(12) requires the con-

tractor to undertake a final settling-up with the government.

The government states that GE cannot circumvent the final accounting required by CAS 413–50(c)(12) by creating an "Active Employees-only segment." In particular, the government contends that the CAS does not authorize the creation of an Active Employees-only segment which ignores the pension costs associated with that segment's Inactive Employees. The government argues that the term "segment," as defined in the CAS, refers to a business unit that reports directly to a home office. *See* 48 C.F.R. § 9904.413–30(a)(11). The government notes that there is nothing in the definition of segment that allows GE, which had historically treated GE Aerospace as several separate segments for pension purposes, to ignore those designations in order to limit the pension costs associated with the business units sold to MMC. According to the government, all of the pension costs associated with the business units that made up GE Aerospace must be accounted for in the final segment closing calculation.

The government further argues that regardless of the pension accounting methodology adopted by a contractor, whether composite, segment-by-segment, or hybrid accounting pursuant to CAS 413–50(c)(9), pension costs attributable to Inactive Employees must always be considered in calculating pension costs both during the time the segment is performing government work and at the time of a segment closing. Contrary to GE's reading of CAS 413–50(c)(9), the government argues that this provision confirms its view that pension costs for both Active Employees and Inactive Employees must be included in all pension calculations for all contractors. The government notes that the CAS Board made it clear in the regulatory history to CAS 413 that in order to "achieve comparability" among all of the accounting methods, contractors using CAS 413–50(c)(9) must allocate pension costs for Inactive Employees to segments.[8]

■ Finally, the government asserts that if GE is not required to undertake a final settling-up for the Inactive Employees associated with units sold to MMC, then GE will receive a windfall. In particular, the government charges that the more than $500 million surplus attributable to the Inactive Employees may never be recovered if it is not recovered now. According to the government, the purpose of the segment closing provision is to settle-up with a contractor when there are no longer government contracts available for amortization purposes for that segment. Under the original and amended CAS 413, each segment is evaluated separately. A contractor cannot simply assume control of a pension surplus attributable to government contributions for the closed segment. The government goes on to explain that this does not mean that the government and a contractor may not work out how best to use that surplus. The government notes that if the contractor continues to perform government contracts in other segments, the contracting parties can negotiate an amortization schedule.

In response to the government's assertions, GE argues that CAS 413 allows for the

---

8. The regulatory history of CAS 413 includes the following explanation of the provision's treatment of Inactive Employees for pension cost purposes:

> In commenting on the staff draft Standard, a number of contractors and actuaries stated that it would be very difficult for many companies to calculate the cost for a segment because they were unable to associate inactive participants with active segments. Several actuaries recommended that the problem could be resolved by creating a pseudo-segment for all inactive participants of the pension plan. The pension cost for this segment can be readily calculated and allocated to the active segments.

CAS Board Internal Memorandum of 6/14/1977.

> The Executive Secretary of the CAS Board presented the following as his understanding of the purpose of allocating costs associated with Inactive Employees to segments:
>
> > It should be noted that when pension cost is developed by means of a composite calculation, each segment automatically receives an allocation of the pension cost applicable to inactive participants. Such an allocation would not automatically be made if separate costs were calculated for inactive participants. To achieve comparability, the proposed Standard requires an allocation to segments of the pension cost for inactive participants.

CAS Board Internal Memorandum of 1/17/1977.

establishment of "Active Employees-only segments." GE argues that its authority to create and transfer an "Active Employees-only segment" is consistent with the Prefatory Comments to the CAS and supported by analogy to CAS 413–50(c)(9). The Prefatory Comment to the CAS states that "[t]he designation of organizational units as segments is the responsibility of the contractor." 42 Fed.Reg. 37192 (July 20, 1977). From this, GE reasons the following: because the CAS allows the contractor to designate an organizational unit as a segment, GE can create a segment of just Active Employees. Then, when applying CAS 413–50(c)(12) to the subject segment, GE needed only to account for the costs of the Active Employees.

GE also draws on CAS 413–50(c)(9) as an indication, by analogy, that the CAS authorizes the creation and eventual closing of an Active Employees-only segment. As noted above, CAS 413–50(c)(9) reads, in relevant part:

> Contractors who separately calculate the pension cost of one or more segments may calculate such cost either for all pension plan participants assignable to the segment(s) or for only the active participants of the segment(s). If costs are calculated only for active participants, a separate segment shall be created for all of the inactive participants of the pension plan and the cost thereof shall be calculated . . . .

48 C.F.R. § 9904.413–50(c)(9).

In response to the government's concern that GE will receive a windfall of over $500 million if a segment closing is not required, GE explains that the over-funding associated with the Inactive Employees will remain in GE's pension fund and will be used in the future to help defray pension costs associated with other government contracts performed by other GE segments. GE contends that the CAS Board did not contemplate that the government would settle and "freeze" the assets and liabilities of the Inactive Employees after a segment was sold. GE argues that the CAS contemplates that the surplus should remain with the contractor until the

contractor finally stops performing any government contracts. GE argues that, when it ceases all government contracting, it will be required to refund any overpayment to the government at that time, should there be any surplus remaining.[9]

The court finds that GE's reading of CAS 413 is not correct and must be rejected. First, the government correctly argues that the Prefatory Comments to the CAS do not support GE. While it is true that contractors have discretion in establishing segments, the definition of segment in the CAS precludes a contractor from excluding employees who are associated with a segment from that segment except as provided for in CAS 413–50(c)(9). Moreover, a close reading of CAS 413–50(c)(9) reveals that it does not allow a contractor to create an "Active Employees-only segment," which ignores the pension costs attributable to Inactive Employees. CAS 413–50(c)(9) allows a contractor to account for costs assignable to "only the *active participants of the segment(s)*" for accounting purposes, as long as it also creates a segment to account for the Inactive Employees. 48 C.F.R. § 9904.413–50(c)(9) (emphasis added). Thus, the section provides that "[t]he total annual pension cost for a segment having active lives shall be the amount calculated for the segment *plus an allocated portion of the pension cost calculated for the inactive participants*. Such an allocation shall be on the same basis as that set forth" for contractors using composite accounting. 48 C.F.R. § 9904.413–50(c)(9) (emphasis added). Accordingly, contrary to GE's reading of CAS 413–50(c)(9), contractors using an Active Employees-only segment approach must still account for pension costs allocable to Inactive Employees on an annual basis. Indeed, this requirement was included in CAS 413–50(c)(9) "to achieve comparability" with those contractors using composite accounting. CAS Board Internal Memorandum of 1/17/1977. As the Executive Secretary of the CAS Board stated, "[t]o achieve comparability, the proposed Standard requires an alloca-

---

**9.** As discussed *infra,* the government disputes that there will ever be a final settling-up of the surplus associated with the units sold to MMC, if a final segment closing is not undertaken to "freeze" the surplus at the time the units were sold.

tion to segments of the pension cost for inactive participants." *Id.*

■ In view of the foregoing, it is clear that regardless of which of the three types of pension accounting methodologies that is selected by the contractor, the final accounting will be the same for each following a segment closing under CAS 413–50(c)(12). CAS 413–50(c)(12) provides that if the contractor has been using segment accounting on a segment-by-segment basis or pursuant to CAS 413–50(c)(9), then the calculation will be based on the pension contributions made for that segment. If, however, the contractor has used the composite method, as GE did in this case, then CAS 413–50(c)(12) requires that the contractor undertake a segment accounting exercise to determine the pension costs attributable to the segment that is being closed pursuant to CAS 413–50(c)(5). Section 413–50(c)(5) of the CAS, in turn, requires that the contractor account for *all* of the funds contributed by or on behalf of the segment. This necessarily includes assets associated with both Active Employees and Inactive Employees. Nothing in CAS 413–50(c)(5) suggests that a contractor may create an Active Employees-only segment and ignore the funds contributed to or on behalf of the segment for Inactive Employees. GE had "complete" segments that made up GE Aerospace. It cannot carve out from those complete segments a new "incomplete" segment of Active Employees only.

Finally, the court shares the government's concern that if there is not a final accounting with regard to the Inactive Employees at this time, then GE may receive a windfall. Although GE argues that at the end of the day, the government will get the benefit of any surplus attributable to Inactive Employees, GE does not dispute that the amount available at that time will not be the same surplus as the surplus identified at the time of the sale to MMC. GE assumes that it will

be able to use up the surplus to defray pension costs for future contracts. This assumption is not consistent with the purpose of CAS 413–50(c)(12). CAS 413–50(c)(12) calls for a final settling-up to make sure that any surplus or deficit attributable to the government is resolved at the time the segment no longer engages in government contracts. The focus of CAS 413–50(c)(12) is on individual segments. Here, the business units, or "segments," making up GE Aerospace stopped performing government contracts when the units were sold to MMC. The time to settle-up with the government for any surplus or deficit attributable to government contributions relating to the closed units is at the time of the segment closing. The government is correctly concerned that, if the government has to wait until GE stops all government contracting, then it may never collect the more than $500 million surplus attributable to government pension fund contributions for the units sold to MMC. The surplus would simply become part of GE's overall pension fund and be used to cover all of GE's pension costs. This result would plainly defeat the final settling up purpose of CAS 413–50(c)(12).[10]

## F. The Government's Reading of the Advance Agreement is Accepted

Because GE's reading of the Advance Agreement is not supported by the plain words of the Advance Agreement and because it is not consistent with CAS 413, GE's reading of the Advance Agreement is not reasonable and does not create an ambiguity which may be resolved by the court. Thus, GE's effort to introduce extrinsic evidence as to the meaning of the Advance Agreement must rejected. Because the terms of the Advance Agreement are not ambiguous, GE cannot rely on the statements of its employees to introduce ambiguities into it. If the language of a contract is unambiguous, then

---

**10.** As noted above, this is not to say that the parties cannot work out a method for using the surplus. In this connection, the court finds GE's contention that the CAS Board could not have contemplated a "frozen" segment of Inactive Employees when it promulgated CAS 413 unpersuasive. To the contrary, CAS 413–50(c)(12) contemplates a "frozen" segment of Active Em-

ployees, Inactive Employees, or both, depending upon whether pension assets and liabilities are transferred. In all cases involving closed segments, the contractor will no longer be able to charge costs associated with the pensions for employees that had been associated with the closed segment.

parol evidence neither is necessary nor will be considered in the interpretation of the provision. *HRE,* 142 F.3d at 1276 (holding that "[o]utside evidence may not be brought in to create an ambiguity where the language is clear") (internal citation omitted). Consequently, because the plaintiff has proffered no reasonable interpretation of the Advance Agreement's pension provisions, and because the government's interpretation is both consistent with the terms of the Agreement and wholly reasonable, the court holds that the government's reading of the Advance Agreement's pension provisions must be accepted. Thus, the court agrees with the government that the Advance Agreement did not finally resolve the plaintiff's obligations under CAS 413–50(c)(12). Accordingly, GE must undertake a final settling-up with the government under CAS 413–50(c)(12) for the Inactive Employees associated with the business units sold to MMC.

**G. The Government is not Equitably Estopped from Requiring GE to Perform a Segment Closing Calculation and Final Settling–Up of Pension Costs for the Inactive Employees that GE Retained Following the Transaction**

GE argues that even if the government is correct and the Advance Agreement is not consistent with the CAS, the government should be equitably estopped from requiring GE to comply with CAS 413–50(c)(12). GE contends that the government's position changed between the time of the Advance Agreement and the present litigation, and that GE detrimentally relied on the government's previous position. Specifically, GE contends that, before 1995, including during Advance Agreement negotiations, the government never maintained that it had the authority to require a contractor to include Inactive Employees in a segment. GE argues that the government's conduct qualifies as affirmative misconduct because it knew

both what the Advance Agreement meant, and what GE believed that it meant. Finally, GE contends that, as a matter of law, it reasonably relied on the government's representations as to the meaning of the Advance Agreement.

The government responds that it did not change its position regarding either the Advance Agreement or CAS 413–50(c)(12). The government argues that the parties never addressed GE's obligations to perform a final segment closing in the Advance Agreement and never finalized any mutual understanding regarding the application of CAS 413 to the sale to MMC. Under such circumstances, the government contends that there is no evidence to show that the government engaged in any affirmative misconduct with GE. In addition, the government argues that GE has not shown any detrimental reliance on its reading of the Advance Agreement or CAS 413–50(c)(12). The government argues that GE's obligation to perform a final settling up with regard to Inactive Employees has no impact upon the sale of GE Aerospace to MMC.

 It is well-settled that for a plaintiff to state a claim for equitable estoppel against the government, it must show the following factors: "(1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury." *JANA, Inc. v. United States,* 936 F.2d 1265, 1270 (Fed.Cir.1991). In addition, the Federal Circuit has made plain that equitable estoppel also requires *"affirmative misconduct* [by the government as] a prerequisite for invoking equitable estoppel against the government." *Rumsfeld v. United Tech. Corp.,* 315 F.3d 1361, 1377 (Fed.Cir.2003).[11]

---

**11.** GE has relied on *USA Petroleum Corp. v. United States,* 821 F.2d 622 (Fed.Cir.1987) and *Broad Avenue Laundry and Tailoring v. United States,* 231 Ct.Cl. 1, 681 F.2d 746 (1982) for the proposition that the element of affirmative misconduct by the government is not required for GE to make a case for estoppel. However, GE has

done nothing to distinguish its case from the recent decision in *Rumsfeld,* 315 F.3d 1361, which states the current test for estoppel in this circuit. As the Federal Circuit held, the plaintiff "must show *affirmative misconduct* [as] a prerequisite for invoking equitable estoppel against the government." *Rumsfeld,* 315 F.3d at 1377. The

■ Tested by these criteria, GE has failed to establish a claim for equitable estoppel in this case. GE bases its argument for equitable estoppel on two allegations: first, the government promised that it would allow GE to exclude Inactive Employees from the segment closing triggered by the sale to MMC; second, the government then changed position and disallowed this accounting method after GE relied to its detriment on this promise.

In support of its estoppel argument, GE relies primarily on the statements of Patrick Ring, Senior Actuary for the DCMA, which are found in an internal September 29, 1995 memorandum from Mr. Ring to Mr. Cavoli. In the memorandum, Mr. Ring states that "[t]he issue regarding the inactive liability is breaking new ground. The government has not pursued this issue in the past." GE argues that this statement proves that the government has changed position. The court disagrees. It is clear that GE has taken the statement out of context. The statement does not reveal a change in position. Rather, it seems to indicates that the government never before had taken a position as to whether the CAS permitted an Active Employees-only segment closing. This view is confirmed by the statement following the above quoted statement, in which Ring states, "[w]e mentioned [the Inactive Employee liability issue] to GE at our last meeting and they were emphatic that creating a segment of only active participants for segment closing purposes was in compliance with CAS. I disagree." Memorandum from Ring to Cavoli of 9/29/95. Thus, contrary to GE's assertions, Mr. Ring's statements do not prove that the government had previously accepted GE's reading of CAS 413–50(c)(12). Instead, the statements make clear that the government's interpretation of CAS 413–50(c)(12) was still open. Indeed, Mr. Ring concludes his memorandum to Mr. Cavoli by noting that the views reflected are still considered to be in "DRAFT" form and will not be "FINALIZE[D] ... UNTIL A CONSENSUS AMONG LEGAL AND PEN-SION EXPERTS IS REACHED." *Id.* (emphasis in original).

GE also relies on several statements in a memorandum by Mr. Yesner, in which he also questions the government's position on segment closings. GE quotes Yesner as having written: "why should GE transfer funds related to retired live liability when GE retained the entire retiree life liability, the entire risk remains with GE?" Reliance on this statement for the proposition that the government believed that it would be fair for GE to withhold pension assets related to the Inactive Employees is wholly out of context and inaccurate. First, much of the memorandum is directed at Mr. Yesner's concerns that the government was improperly trying to apply the 1995 CAS amendments to GE's 1993 sale to MMC. The government ultimately determined that the new CAS could not be retroactively applied. Moreover, it is clear from reading the record, that the question asked by Mr. Yesner, in his Memorandum to Mr. Cavoli, was in effect a way of playing Devil's advocate, that is, putting himself in the shoes of GE to anticipate arguments that GE would make. A cursory reading of the full memorandum shows that Mr. Yesner did not support the implication of this question, that is, that GE should retain more than $500 million in excess pension assets attributable to contributions made by the government in connection with Inactive Employees associated with the Transaction. Rather, Mr. Yesner was merely concerned that, when posed by GE, this question would prove confusing to the court. Memorandum from Yesner to Cavoli of 12/23/98, at 1–5. Thus, the plaintiff's use of Yesner's statements in his December 23, 1998 memorandum to prove that the government changed position or supported the plaintiff's position at any time is unfounded.

Finally, GE quotes Mr. Yesner as having written the following in an October 3, 1995 memorandum: "Now for the new arguments generated by DCAA headquarters. Do not lose sight over the fact that the sale took place approximately one year prior to the

---

element of misconduct has previously been recognized as required by this court as well. *E.g.* *Ervin & Assoc., Inc. v. United States,* 59 Fed.Cl.

267, 297 (2004); *Capital Properties, Inc. v. United States,* 56 Fed.Cl. 427, 436 (2003).

promulgation of the new CAS." Memorandum from Yesner to Cavoli of 10/3/1995. GE implies that this statement indicates that the only reason why the government took the position that GE would have to account for the pension costs of Inactive Employees is because it originally thought that this outcome was required by the 1995 CAS amendments. Contrary to GE's suggestion, however, this statement does not indicate that the government changed position with regard to the Inactive Employees; rather, it merely indicates that the government had not before considered the effect of the CAS on its rights and obligations vis-a-vis GE. GE does not quote the remainder of the memorandum, in which Mr. Yesner goes on to note, that "no court has ever heard this argument before." *Id.* This statement further supports the inference, as does much of the evidence that GE proffers, that the issue of the costs of the Inactive Employees simply had not been addressed by the parties at the time of the Advance Agreement. These statements do not, therefore, support GE's contention that the government changed position, thereby engaging in governmental misconduct, which caused GE to rely, to its detriment, on these statements.

In sum, none of the statements GE relies upon establishes that the government affirmatively misled GE regarding its views of CAS 413. They do not prove that the government had previously determined that CAS 413 did not require a final settling-up of pension costs attributable to the Inactive Employees that GE retained. At best, the statements show that the issue of segment closings and calculations under CAS 413–50(c)(12) was very confusing and unsettled. Indeed, several of these questions were not resolved until the court's decision in *Teledyne* in 2001.

Finally, the court agrees with the government that, even if GE had established that the government had somehow misled it into believing that there would not be a final settling-up for the Inactive Employees associated with the business units sold to MMC, there is no evidence to show that GE relied upon the government's alleged "misrepresentations" to its detriment. GE does not suggest that the government's reading of CAS 413 in any way changes the agreement GE made with MMC. The government does not seek to reopen or reexamine the transfer of pension assets to MMC, which the government concedes was done with its approval. The government's focus is only on the pension surplus associated with the Inactive Employees who were once part of the business units sold to MMC. GE agreed to retain pension liability for those Inactive Employees. At issue now is the amount of pension assets needed to cover that liability. Any surplus must be accounted for with the government.

GE has not produced any evidence to show that its agreement with MMC was tied to an agreement that GE could keep the surplus attributable to the Inactive Employees associated with the segment sold to MMC. Indeed, there is no discussion in any of the GE statements to suggest that they calculated and specifically based their agreement with MMC on the right to keep the $500 million surplus attributable to Inactive Employees. Given the amount of money at stake it is inconceivable that the issue would not have been expressly discussed if it were critical to the Transaction. Absent any evidence to show that the government is seeking to change the terms of the GE–MMC Transaction, GE has failed to show that it suffered any detrimental reliance based on its understanding of the Advance Agreement.

Without evidence of any affirmative misconduct by the government or detrimental reliance on the part of GE, GE's claim for equitable estoppel must be rejected.

## CONCLUSION

In light of the foregoing, the court holds that the language of the Advance Agreement is plain and did not finally resolve GE's obligation to conduct a final segment closing calculation under CAS 413–50(c)(12). Thus, GE is required to undertake a final segment closing calculation to account for the pension surplus attributable to Inactive Employees associated with the closed segment. Finally, the court holds that GE failed to establish a claim for equitable estoppel. Accordingly, the court **GRANTS** the government's Sep-

tember 29, 2003 cross-motion for partial summary judgment and therefore **DENIES** the plaintiff's November 7, 2003 cross-motion for partial summary judgment. The parties shall file a joint status report with the court, detailing a schedule for final resolution of this case, no later than **June 30, 2004.**