KING FISHER CO., Plaintiff,

v.

THE UNITED STATES, Defendant.

No. 99–873C.

United States Court of Federal Claims.

Dec. 5, 2001.

Richard P. Reichstein, Chicago, IL, for plaintiff.

Joseph Trautwein, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Acting Assistant Attorney General, and Director David M. Cohen, for defendant. Alan Caramella, Department of the Navy, of counsel.

## OPINION

FIRESTONE, Judge.

This case arises over a contract entered into on December 31, 1996, between the United States Department of the Navy ("Navy" or "government") and King Fisher Company ("King Fisher") to install a radio frequency fire alarm reporting system at various locations throughout Camp Lejeune Marine Corps Base, North Carolina. King Fisher contends that the government breached its contract by requiring King Fisher to undertake work that was not required by the

contract and by delaying King Fisher's completion of the work.

The case is presently before the court on the parties' cross motions for partial summary judgment. At issue is whether the contract required King Fisher to install the street box radio transmitters for the fire alarm system onto aluminum poles at seventy-two locations on the base or at only one location. King Fisher claims that the contract only required King Fisher to install one of the street box radio transmitters onto a new aluminum pole and that the remaining seventy-one transmitters were to be mounted using pre-existing wooden poles at each location. The government contends that the contract unambiguously required King Fisher to install the transmitters onto new aluminum poles at all seventy-two locations.

For the following reasons, the court grants the government's motion for partial summary judgment.

## FACTS

### I. Background Facts

The following facts are not in dispute unless otherwise noted.

#### A. The Contract

In May 1996, the government solicited offers to provide materials and equipment to install radio frequency fire alarm equipment at the Marine Corps Base, Camp Lejeune, North Carolina. On December 31, 1996, the United States Department of the Navy awarded Contract No. N62470–90–C–6840 ("the contract") to plaintiff King Fisher in the amount of $438,450.

Section 01010, Part 1.2.1 of the contract, labeled "The Project Description," provided: "The work includes the installation of new radio type fire reporting system, including electric service equipment and the removal of existing fire alarm street call boxes and incidental related work." The contract contains a number of explanatory drawings, including the drawings at issue in this case: "SITE PLAN—MIDWAY PARK HOUSING AREA," or "E–11," "SITE PLAN—PARADISE POINT HOUSING AREA," or "E–12," and "DETAIL: STREET BOX TRANSMITTER," or "T–1."

The E–11 sheet actually incorporates several different components: maps, diagrams, and a legend. Sheet E–11 includes a map of the Midway Park Housing area with symbols throughout the map directing the contractor to perform various tasks around the site. A legend is included on the map in the top right corner, which explains the meaning of the symbols to guide the contractor's performance. Those symbols are described more fully below. One location on the E–11 map gives additional guidance with a special notation reading, "Pole (40'–3), Provide 15 Amp/1–Pole Branch Breaker in Existing Panel." This special notation is a key element of King Fisher's argument discussed *infra* part II.B. Additionally, there is a "Street Box Radio Transmitter Power Riser Diagram" ("power riser diagram") included in the top left corner of sheet E–11. This diagram shows the existing wooden street light poles and the new aluminum poles with the radio transmitters approximately twenty-five feet away. Finally there is, a diagram entitled, "Grounding Detail at Enclosed Breaker" ("grounding detail diagram") included next to the power riser diagram.

Similarly, the E–12 sheet contains a map of the Paradise Point Housing Area, again with symbols throughout the map to guide the contractor's performance. E–12 also includes the same legend, power riser diagram, and grounding detail diagram as E–11.

The power riser diagrams on sheets E–11 and E–12 both direct the contractor to, "See sheet T–1 for street box transmitter detail." Sheet T–1, in turn, provides a detailed diagram of a street box radio transmitter, including instructions for mounting the transmitter onto an aluminum pole.

This dispute centers on the legend that was included on site plan sheets E–11 and E–12, which identified the meaning of the symbols used at various locations on the two site maps. According to the legends, the symbols used on the maps identified locations where the contractor was to: (1) "remove existing fire alarm reporting transmitter street box"; (2) "remove existing fire alarm reporting transmitter & provide street box

radio transmitter"; and (3) "[provide] street box radio transmitter." The legend also identified: (1) "existing power pole with configuration as indicated;" (2) "existing pole-mounted area light;" and (3) "existing transmitter ID number."

The power riser diagrams on E–11 and E–12 are identical. They depict an "Existing Power Pole" next to a "Street Box." The diagram indicates that the distance between an existing pole and a street box transmitter was to be "approx. 25–ft." The diagram also directs the contractor to "see sheet T–1 for Street Box Transmitter Detail." The T–1 sheet, in turn, shows a detailed drawing of an "aluminum pole" with explicit instructions as to how the various components of the fire alarm system were to be affixed. The T–1 sheet also includes a note, "See Sheet E–11 Power Riser Diagram."

All of these contract drawings were provided to King Fisher prior to award, and there is no evidence to show that King Fisher ever raised any questions regarding the drawings or their content.

### B. King Fisher's Performance

Prior to starting performance, the parties conducted a pre-construction conference on March 12, 1997. Before that meeting, King Fisher had submitted certain drawings, as well as a schedule and price list, to the government. The drawings indicated that the new street box transmitters would be mounted on new aluminum poles. The parties agree that Lieutenant K.L. Roye, Assistant Resident Officer in Charge of Construction for the Navy, approved these drawings on February 6, 1997, but did not approve the price list until after the pre-construction conference. While the price list submitted by King Fisher, and never approved by the Navy, included the costs for seventy-two new aluminum poles, an amended list that was subsequently submitted by King Fisher did not include the cost for aluminum poles at any location, including the one location which King Fisher agrees required a new aluminum pole.

King Fisher contends that at the pre-construction meeting, it presented the government with a drawing that identified King Fisher's plans for mounting the new street box transmitters onto the existing wooden poles at the sites identified on site plans E–11 and E–12. King Fisher further contends that the government's inspector, Tom Corbin, did not object to King Fisher's wood mount approach.

On August 4, 1997, King Fisher began installing the street box transmitters onto the existing wood light poles at the locations indicated by sheets E–11 and E–12. King Fisher began with an initial sample box, which it documented in its "Contractor's Quality Control Report." The copy of this report provided to the court by King Fisher does not contain the notes of the government's inspector, Tom Corbin. Corbin's own notes state that he believed that the contract required installation onto an aluminum pole.

Thereafter, on September 3, 1997, Lt. Roye sent a letter to King Fisher stating that pursuant to the contract drawings (specifically drawing T–1), "the street box radio transmitters were to be mounted on aluminum poles." Subsequent correspondence between King Fisher and the government reflect that King Fisher believed that the contract only required King Fisher to mount the street box transmitters onto the existing wood poles and that King Fisher also believed that the government had agreed with this interpretation at the pre-construction conference on March 12, 1997.

On October 8, 1997, Janice Gurganus, the Navy's contracting officer ("CO"), sent a letter to King Fisher stating that Lt. Roye had correctly ordered King Fisher to mount the street box transmitters on new aluminum poles. Specifically, the letter stated:

> Lt. Roye has been delegated the duties of an Assistant Officer in Charge of Construction. In that capacity, he can sign letters of clarification on behalf of the contracting officer, which he did. It is, therefore, the position of the government that Lt. Roye acted within the scope of his authority.

King Fisher followed the CO's instructions and removed the new transmitters from the existing wood poles and re-mounted the boxes on aluminum poles.

## II. Procedural Posture

### A. Certified Claim and Contracting Officer's Decision

On March 26, 1999, King Fisher submitted a certified claim to the Navy in the amount of $457,039, alleging that the Navy breached its contract by requiring King Fisher to install aluminum poles that it contends were not included in the contract. King Fisher also claimed that the government owes it damages for delaying the completion of the project by not completing its final inspection in a timely manner.

On June 30, 1999, the Navy denied King Fisher's claim. Specifically, in addressing the claim relating to the installation of aluminum poles, the CO explained in her denial letter that in order to be ambiguous, a contract's language must be susceptible to more than one reasonable interpretation. Further, the CO explained that to interpret a contract, "it must be read in its entirety, giving full effect to all words and phrases contained therein to ascertain the Government's intent. The contract cannot be read so as to render any portion useless, meaningless, inexplicable or superfluous and an interpretation that does so is unreasonable." Finally, the CO found that the power riser diagrams on sheets E–11 and E–12:

> [C]learly indicate that the transmitter detail on Sheet T–1 applies to those locations where transmitters are to be installed.... To conclude that the details for the power riser and transmitter apply to only the one location in the lower right corner of Sheet E–11 would render meaningless the detail on Sheet E–12. Further, there would be no detail instructing you how to install the other seventy new transmitters marked by solid arrows on Sheets E–11 and E–12.

### B. This Litigation

King Fisher filed the present action on October 15, 1999, seeking damages in the amount of $590,405 plus costs in connection with the CO's denial of its equitable adjustment claim. In August 2001, the parties agreed to file cross motions for summary judgment on the issue of whether the contract required King Fisher to install aluminum poles at all seventy-two locations indicated on sheets E–11 and E–12, or at only one location.

King Fisher contends that because sheet T–1, the "Street Box Radio Transmitter" detail, only refers the contractor to the power riser diagram on sheet E–11, and because only one location on the E–11 drawing indicates that the contractor needed to "provide 15 Amp/1 pole Branch; Breaker in Existing Panel," the contract only called for the installation of one aluminum pole. In support of its interpretation of the contract, King Fisher relies on its company notes from the pre-construction meeting on March 12, 1997, which allegedly indicate that King Fisher was to mount the street box transmitters on existing wood light poles. King Fisher also presented the affidavit of Mike Klein, King Fisher's project manager, to argue that the government approved a revised price list that identified the price of only one aluminum pole, and the affidavit of Steve Dmytriw, King Fisher's field superintendent, to argue that King Fisher initially installed the street box transmitters on the wood poles in compliance with the wishes of the government's inspector at the pre-construction meeting.

Ultimately, King Fisher contends that the contract was not ambiguous, and that it initially performed the contract properly. Based on this view, King Fisher argues that the government's insistence on installation of seventy-one aluminum poles, in addition to the single pole indicated on sheet E–11, was a contract change that requires payment.

The government argues in its cross motion that King Fisher has misread the contract. According to the government, the contract unambiguously required King Fisher to install aluminum poles for all seventy-two of the street box radio transmitters. Specifically, the government asserts that the power riser diagram on sheets E–11 and E–12 show that the transmitters were to be installed approximately twenty-five feet from the existing wood poles. The power riser diagrams on both E–11 and E–12 also cross-reference the T–1 sheet labeled, "Detail: Street Box Radio Transmitter." The T–1 detail, in turn, shows that the street box transmitters were to be installed on aluminum poles. The gov-

ernment therefore argues that, given the plain meaning of the drawings, and the labels assigned to each feature, it is not reasonable to interpret the drawings as requiring the contractor to mount the street box transmitters on the existing wooden poles.

The government further denies that there was a mutual understanding at the pre-construction meeting, and contends that as soon as the government realized that King Fisher was mounting the street box transmitters on the existing wood poles in August 1997, the government informed King Fisher that it was improperly installing the transmitters.

In the alternative, the government argues that even if the court finds that King Fisher's reading of the contract is reasonable and that the contract was ambiguous, the ambiguity was plain from the face of the drawings and was therefore a patent ambiguity. According to the government, because it was a patent ambiguity, King Fisher had a duty to inquire as to the true meaning of the contract language before submitting a bid. Because King Fisher failed to make any inquiry, its interpretation of the contract is barred.

Oral argument was held on November 19, 2001.

## DISCUSSION

### I. Standard of Review

This matter turns on questions of contract interpretation that are properly before this court on motion for partial summary judgment. *Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed.Cir.1996); *Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 223 (1990). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

### II. The Contract Is Not Ambiguous

The court finds that the contract is not ambiguous and that it plainly required the contractor to install the seventy-two street box radio transmitters identified on site plans E–11 and E–12 on new aluminum poles.

 An ambiguity exists when there is more than one reasonable interpretation of a contract. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996). Whether an ambiguity exists is a question of law. *See id.* (citing *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993)). "To show an ambiguity, it is not enough that the parties differ in their respective interpretations of a contract term; rather, both interpretations must fall within a zone of reasonableness." *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed.Cir.1999) (citations omitted). "An interpretation which gives reasonable meaning to all parts of a contract is preferred to one which renders part of it insignificant or useless." *Blake Construction Company, Inc. v. United States*, 987 F.2d 743, 746–747 (Fed.Cir.1993); *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed.Cir.1992). To determine whether an ambiguity exists, the court first looks to the plain language of the agreement. *See McAbee Construction, Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996).[1]

---

1. Plaintiff's argument that great weight should be given not to the "bare text of the contract," but rather to "external indications of the parties' understanding," is unpersuasive. It is well established that contract interpretation begins with the language of the agreement. *See McAbee Construction*, 97 F.3d at 1435 (holding that when courts are to determine whether terms of a contract are ambiguous, "we begin with the plain language"); *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed.Cir.1993). *See also C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed.Cir.1993) ("A contract is read in accordance with its express terms and the plain meaning thereof."). If the contract language is not clear, it may be appropriate to inspect the par-

■ In this case, the meaning of the contract is plain from a review of the relevant maps, drawings, and symbols. Sheet T–1 is clearly marked, "DETAIL: STREET BOX RADIO TRANSMITTER." The T–1 drawing shows how the government expected the radio transmitters to be installed on *aluminum* poles. Next, the legends on sheets E–11 and E–12 provide a symbol for the T–1 radio transmitter specifications. This symbol is used on both the E–11 and E–12 site maps to show where the radio transmitters are to be placed around Camp Lejeune at all seventy-two locations.

When the site maps and legends are read together, sheets E–11 and E–12 plainly show that the T–1 specifications are applicable to *every* street box radio transmitter. King Fisher's contention that the government provided the extensive specifications on sheets E–11 and E–12, as well as on T–1, to explain how a *single* street box radio transmitter was to be placed on a *single* pole does not comport with the drawings or with common sense. It is unreasonable to assume that because the diagram of the existing pole identified an amp box, the detailed street box diagram applied only to the one location with a pre-existing amp box. The two site maps identified seventy-two places around the camp where street box transmitters were to be installed, and each was identified separately on the map. The legend plainly directed the contractor to the street box radio transmitter diagram, or T–1, and it is this transmitter box that is the primary focus of this contract. It must therefore, also be the focus of this court's inquiry into the proper contract interpretation. Ultimately, given the detailed diagram drawings and specifications on sheets T–1, E–11, and E–12, the assumption that the specifications were only to be used for one location, and that the government had not provided any guidance as to how it wanted the street box radio

transmitters placed at the remaining seventy-one locations, does not conform with common sense.[2]

Indeed, while a special notation is made on the E–11 drawing, giving limited credence to King Fisher's contentions, the same legend also appears on sheets E–11 and E–12. This legend does not differentiate between those locations which should receive a new aluminum pole and those which should not. E–11 and E–12 both refer the contractor to T–1 and the detailed drawing illustrating each street box radio transmitter's placement on an aluminum pole. The court cannot accept an interpretation of a contract that requires it to read away an entire diagram on a drawing. The court may only accept a contract interpretation that gives meaning to all of its terms.

■ However, even if the court were to find that the identification of an amp box on the existing pole diagram created an ambiguity, it would have to conclude that the ambiguity was plain from the face of the contract and was therefore patent. A patent ambiguity is one that is "obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start." *H & M Moving, Inc. v. United States*, 204 Ct.Cl. 696, 499 F.2d 660, 671 (1974). To the extent that King Fisher believed that the specification drawings of sheets T–1, E–11, and E–12 pertained to only a single pole on the E–11 site plan, and despite the inclusion of the same specification on the E–12 site plan, it certainly had a duty to inquire as to the true meaning of the contract drawings. It is "obvious, gross [and] glaring" that the symbol referring to drawing T–1 is cross-referenced on *both* E–11 and E–12, indicating that the T–1 specifications were to be followed for all seventy-two locations. The United States Court of Appeals for the Federal Circuit has

ties' conduct under the agreement. Here, however, because the language is unambiguous, the court need not go past the plain language of the contract to interpret its meaning.

**2.** During oral argument, the government argued for the first time that new 15 amp breaker boxes needed to be mounted on each of the new poles of the Camp Lejeune radio alarm transmitter

project. It appears from the diagram that this well may be true, however, it is well settled that statements of counsel that are not supported by an affidavit by someone with firsthand knowledge are not entitled to any judicial weight. *See Wyler v. United States*, 725 F.2d 156, 160 (2d Cir.1983). As such, this court will not consider the contention.

settled how such patent ambiguities must be viewed by this court:

> The existence of a patent ambiguity in a government contract "raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation." That duty requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid. Absent such inquiry, a patent ambiguity in the contract will be resolved against the contractor.

*Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1474–1475 (Fed.Cir.1997) (citations omitted). King Fisher admits that it did not make any inquiry. Accordingly, King Fisher's interpretation of the contract must be rejected.

■ Finally, King Fisher's reliance on the government's alleged approval of King Fisher's wood pole mount diagram and of its price list without aluminum poles is misplaced. Section 00720, sub-section FAC 5252.201.9300, of the contract expressly required approval by the CO.

> In no event shall any understanding or agreement between the contractor and any Government employee other than the Contracting Officer on any contract, modification, change order, letter of verbal direction to the Contractor be effective or binding upon the Government. All such actions must be formalized by a proper contractual document executed by an appointed Contracting Officer. The Contractor is hereby put on notice that in the event a Government employee, other than the Contracting Officer, directs a change in the work to be performed, or increases the scope of the work to be performed, it is the Contractor's responsibility to make inquiry of the Contracting Officer before making the deviation. Payments will not be made without being authorized by an appointed Contracting Officer with the legal authority to bind the Government.

King Fisher has not presented any evidence to show that it specifically brought its proposed wood mount approach to the attention of the contracting officer or her representative. Apparently, the drawing was only given to the government's inspector. Even assuming *arguendo* that the inspector agreed with King Fisher's approach, the inspector's acquiescence or approval is not binding on the government, unless the contract provides that it will be. *See Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 ("It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority.... Moreover, 'anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority.' ") (citations omitted). *See also C.P. Squire Contractors, Inc. v. United States*, 716 F.2d 865 (Fed.Cir. 1983) (holding that when an agent of the government acts outside of the authority delegated to him, his acts do not create any liability on the part of the government).

King Fisher concedes that there is no evidence to show that the CO approved installation of seventy-one street box transmitters on the existing wood poles. Without proof of approval by the CO, the government was fully authorized to hold King Fisher to the original contract terms and thus require the installation of the street box transmitters on aluminum poles at all seventy-two locations on E–11 and E–12. *See Harbert/Lummus*, 142 F.3d at 1432.

## CONCLUSION

For the reasons stated above, defendant's motion for partial summary judgment is **GRANTED,** and plaintiff's motion for partial summary judgment is **DENIED.** The parties shall report back to the court by **Monday, January 7, 2002,** with a joint status report regarding further proceedings in this case.