**JACOBS ENGINEERING GROUP, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 02–1500 C.**

United States Court of Federal Claims.

Jan. 12, 2005.

Robert J. Symon, Counsel of Record, Claire E. Kresse, Of Counsel, Spriggs & Hollingsworth, Washington, DC, for plaintiff.

Michael Fellman Bahler, Trial Attorney, David M. Cohen, Director, Peter D. Keisler, Assistant Attorney General, United States

Department of Justice, Washington, DC, Thomas J. Russial, Chief Counsel, Department of Energy, Pittsburgh, PA, for defendant.

### OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff, Jacobs Engineering Group ("Jacobs") filed a Motion for Partial Summary Judgment. Defendant, the United States ("Government"), filed an Opposition to Plaintiff's Motion for Partial Summary Judgment and a Cross–Motion for Summary Judgment. Jacobs filed an Opposition to Defendant's Cross–Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment; the Government thereafter filed its Reply. Following oral argument on the cross-motions, the parties filed supplemental briefs at the Court's request. For the following reasons, defendant's motion is GRANTED, and plaintiff's motion is DENIED.

### BACKGROUND [1]

#### I. Contract Formation and Performance

The United States Department of Energy ("DOE") has long been interested in gasification, a means of converting coal to electricity and fuel, as an alternative source of energy. Report of the National Energy Policy Development Group, May 2001, D.App. 4–7; United States Department of Energy Report to Congress: Gasification Product Improvement Facility, February 1991, D.App. 12. Once a promising technology like gasification is identified, the DOE often enters into cost-shared research and development contracts with contractors in the private sector for the purpose of advancing the technology to the market. Declaration of Dale K. Schmidt ¶ 5, D.App. 1. In 1990, the DOE became interested in testing Integrated Gasification Combined Cycle ("IGCC") technology through the construction of a small-scale pilot facility in Morgantown, West Virginia. Congress authorized funding for the project, but required the DOE to obtain private sector commitment to share at least 20 percent of the cost of the facility. H.R. REPORT No. 101–971, at 62 (October 27, 1990).

Contractors who enter into cost-shared research and development contracts generally bear at least 20 percent of project costs. Contractors also bear the risk that the contracts may fail in the development stage. Schmidt Dec. ¶ 5, D.App. 1. In return, the contractors receive financial support in developing new technologies, and the opportunity to derive substantial benefit when those technologies are introduced to the market. *Id.* ¶ 2. Pursuant to 42 U.S.C. § 5908(a), the United States takes title to "subject inventions," which are any inventions conceived or first actually reduced to practice under research and development contracts, unless the DOE waives its rights in such inventions. A contractor must apply for, and be granted, a patent waiver in order to retain title to a subject invention; such waiver may be granted at the time of contracting. 42 U.S.C. § 5908(c), (d).

On May 24, 1991, the DOE issued a solicitation inviting proposals for the development, design and construction of a gasifier. The solicitation also provided that the successful offeror would acquire a first right of refusal to enter into a cooperative research and development agreement with DOE to further develop gasification technology at the facility. Government's Proposed Findings of Uncontroverted Facts at 4. CRS Sirrine Engineers, Inc. ("CRSS") submitted a proposal and commenced negotiations with the DOE. During negotiations, CRSS indicated that it was not willing to commit to bear 20 percent of the costs of the project until it found subcontractors to help absorb the costs. Declaration of Lisa A. Jarr ¶¶ 3–6, D.App. 40–41. The DOE, in turn, was not willing to grant CRSS a patent waiver on the technology it planned to develop during the project unless CRSS

---

1. The facts set forth in this portion do not constitute findings of fact by the court. Rather, they are presented only to provide a basis for analysis of the parties' positions. These facts are drawn mainly from documents contained in appendices to Plaintiff's Motion for Partial Summary Judgment, "J.App.," and Defendant's Cross–Motion for Summary Judgment, "D.App."

committed to bear 20 percent of project costs. The issue was resolved through Clause H.099, a Project Continuance clause, which gave CRSS the right to withdraw through Task 4 of the Contract if the DOE did not grant it a patent waiver, or if CRSS could not obtain a cost sharing partner. The Project Continuance clause stated that:

> The parties hereto agree that upon completion and delivery of the Conceptual Design in Task 4 of the Statement of Work, continuance of the project is contingent upon the contractor obtaining adequate cost-sharing [partnering with subcontractors to help pay the 20 percent of the costs] and upon the Contractor being granted an advance patent waiver, satisfactory to Contractor by the DOE Patent Counsel.
>
> In the event that the Contractor elects to discontinue the project, the Contractor will be liable for 20% of the costs incurred during the performance period.

J.App. at 26.

On September 30, 1992, the DOE awarded Contract No. DE–AC21–92MC–28202 ("Contract") to CRSS to develop, design, fabricate and construct a gasification facility in Morgantown. Compl. ¶ 4. On August 1, 1994, Jacobs purchased CRSS and all of its rights and obligations under the Contract. Compl. ¶ 7.

Contract clause I.020a, Cost Sharing Contract—No Fee, expressly incorporating Federal Acquisition Regulation ("FAR") § 52.216–12, provided that "[t]he Government shall not pay to the Contractor a fee for performing this contract." 48 C.F.R. § 52.216–12. Jacobs, therefore, did not collect a fee during the project. Instead, as allowed by DOE regulations, the amount of fee foregone was "considered in establishing the degree of cost participation." Department of Energy Acquisition Regulation ("DEAR") § 917.7003(h), D.App. 99. Thus, the Government's share of the Contract costs included an element of "foregone fee" attributable to Jacobs and its key subcontractors. For billing and payment purposes, all costs incurred by Jacobs and its subcontractors, together with the foregone fee, were submitted to the DOE for payment, and the DOE paid 80 percent of the invoiced amount. Pl. Opp. at 12; "Representative Jacobs Invoice," D.App. 101–07.

As provided for by the Project Continuance clause, Jacobs obtained adequate cost-sharing and was granted an advance patent waiver by the DOE. Transcript of Proceedings, *Jacobs Engineering Group, Inc. v. United States*, No. 02–1500C at 56 (Fed.Cl. May 17, 2004). During the design and engineering stage of Phase I of the Contract, it became apparent that the costs to complete the project were going to be substantially greater than originally estimated. The DOE and Jacobs tried to reduce the scope of the project but the design changes needed to bring the project within budget were too significant and would have resulted in a facility that did not meet project objectives. Faced with a cost overrun that could not be funded within the DOE's projected gasification budget, the DOE terminated the contract for convenience. Gov't Prop. Facts at 12.

## II. Cost–Sharing Arrangement Clause

The Contract included a Cost–Sharing Arrangement clause, which specified:

The Contractor and the Government agree to share the cost of the effort for Phase I and Phase II as follows:

|  | Government (80%) | Contractor (20%) | Total (100%) |
|---|---|---|---|
| Phase I | $19,850,784 | $4,962,696 | $24,813,480 |
| Phase II | $ 3,149,515 | $ 787,379 | $ 3,936,894 |
| Total | $23,000,299 | $5,750,075 * | $28,750,374 |

\* Includes foregone fee in the amount of $1,181,549 for Phase I and $169,531 for Phase II.

B.007(S), J.App. 3.

### III. Termination Clause, FAR § 52.249–6 Termination (Cost–Reimbursement)

The Contract also included a Termination clause, FAR § 52.249–6, which stated that "the Government may terminate performance of work under this contract in whole or, from time to time, in part, if the Contracting Officer determines that a termination is in the Government's interest . . . ." 48 C.F.R. § 52.249–6(a). "After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer[.]" 48 C.F.R. § 52.249–6(e). "The Contractor and the Contracting Officer may agree on the whole or any part of the amount to be paid[.]" 48 C.F.R. § 52.249–6(f). The Termination clause also provided:

> If the Contractor and the Contracting Officer fail to agree in whole or in part on the amount of costs and/or fee to be paid because of the termination of work, the Contracting Officer shall determine . . . (1) All costs reimbursable under this contract, not previously paid, for the performance of this contract before the effective date of the termination[.]

48 C.F.R. § 52.249–6(g). The Termination clause specified that "the cost principles and procedures in Part 31 of the [FAR] . . . shall govern all costs claimed, agreed to, or determined under this clause." 48 C.F.R. § 52.249–6(h). Lastly, the Termination clause stated that "provisions of this clause relating to fee are inapplicable if this contract does not include a fee." 48 C.F.R. § 52.249–6(m).

### IV. Claim to the Contracting Officer

After the Government terminated the Contract for convenience, Jacobs, in accordance with the Termination clause of the Contract, negotiated settlement agreements with its subcontractors, segregated costs for the work up to the point of the termination and identified costs associated with termination. Letter of July 31, 1996 from Jacobs to Joseph Maury, Contract Administrator, J.App. 174. Jacobs then submitted to the DOE Contract Administrator a termination settlement proposal for reimbursement of all costs it incurred in performance of the contract in the amount of $7,121,780.19. Termination Settlement Proposal SF 1437, J.App. 178. Deducting $5,579,582.60 already paid by the DOE, Jacobs requested a net payment of $1,542,197.59. *Id.* After the Defense Contract Audit Agency conducted a termination audit, the parties attempted and failed to negotiate a settlement. Letter of April 29, 2002 from Jacobs to Randolph Cooper, Contracting Officer, J.App. 262.

On April 19, 2002, Jacobs submitted a certified claim for final decision of the Contracting Officer ("CO"). *Id.* On September 13, 2002, the CO issued a final decision denying most of Jacobs's claimed costs. Contracting Officer's Final Decision, J.App. 167–73. The CO calculated that all of the costs under the Contract, including Jacobs's fees, equaled $7,064,721.79. The CO concluded that the DOE's 80 percent share of the costs was $5,651,777.43, and Jacobs's 20 percent share was $1,412,944.36. J.App. 173. The CO held that because the DOE had already paid Jacobs $5,579,600.60 for costs, all that was due to Jacobs was $72,176.83, which the CO awarded. *Id.*

### V. Proceedings in the Court of Federal Claims

On November 1, 2002, Jacobs filed a complaint in the United States Court of Federal Claims, claiming $1,542,197 plus interest. Compl. ¶ 14.

Jacobs, in its Motion for Partial Summary Judgment, argued that the Contract unambiguously specified that the Cost–Sharing Arrangement clause did not apply in the event of a termination for convenience by the Government. Therefore, Jacobs claimed it was entitled to recover 100 percent of the allowable costs incurred in performing the Contract. Pl. Mot. for Partial Summ. J. at 1. Jacobs stated that the amount of allowable costs was $922,386, noting that "the only other issues that remain in the case, after resolution of this issue, is Jacobs's entitle-

ment to certain costs incurred on the project and fee on costs incurred." *Id.* at 2 n. 2. Jacobs argued in the alternative that the Contract language was, at best, ambiguous, and that under the doctrine of *contra proferentem,* the ambiguity should be resolved against the Government, which drafted the Contract. Pl. Mot for Partial Summ. J. at 5 (citing *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993)). The Government, in its opposition to Jacobs's motion, argued that the Contract was unambiguous and that it required cost-sharing to apply even in the event of a termination for convenience.

In its Opposition to Defendant's Cross-Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment, Jacobs requested that the Court grant it judgment in the amount of $1,485,121.00. Pl. Opp. at 1. The additional $562,735 Jacobs requested represented foregone fees that Jacobs believed were due and owing from the Government. Pl. Opp. at 13 ("Also at issue for resolution by the Court, but less significant in terms of damages, is Plaintiff's entitlement to fee in addition to its reimbursable costs. The contract expressly states that the contractor is not entitled to fee. However, Jacobs contends this provision was waived by the government."). Jacobs stated in its opposition and reply that it "moves this Court for summary judgment in its favor," and "requests that this Court summarily enter judgment in favor of Plaintiff ... for costs *and fee* incurred by Plaintiff under its contract[.]" Pl. Opp. at 1 (emphasis added). Because Jacobs, in its opposition and reply, included a claim for foregone fee and requested that the Court grant summary judgment in its favor, the Court concludes that Jacobs converted its Motion for Partial Summary Judgment to a Motion for Summary Judgment. This Opinion, therefore, disposes of the entirety of Jacobs's claim.

### DISCUSSION

#### I. Standard of Review of Motions for Summary Judgment

Under Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"), a party will prevail on a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"When making a summary judgment determination, a court must consider the existence of a genuine issue as to any material fact." *Nicholson v. United States,* 29 Fed.Cl. 180, 186 (1993) (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.) " 'An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, while the materiality of the fact is determined by reference to applicable legal standards.' " *Id.* (quoting *Webster University v. United States,* 20 Cl.Ct. 429, 432 (1990) (citing *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562, 1567 (Fed.Cir. 1987))).

If both parties move for summary judgment and allege an absence of genuine issues of material fact

> "the court is not relieved of its responsibility to determine the appropriateness of summary disposition." Rather, the court evaluates each motion on its own merits, applying the same standard for summary judgment to each motion. Simply because each party asserts a contradictory claim, it does not follow that "if one is rejected the other necessarily is justified."

*General Electric Company v. United States,* 60 Fed.Cl. 782, 789 (2004) (quoting *J. Cooper & Assocs., Inc. v. United States,* 53 Fed.Cl. 8, 15 (2002)).

#### II. Interpretation of Government Contracts

Interpretation of the terms of a government contract is a matter of law. *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985). "The interpretation of a contract 'begins with the language of the written agreement.' " *S. Cal. Edison v. United States,* 58 Fed.Cl. 313, 321

(2003) (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed.Cir. 2003)). It is a well-established principle of contract interpretation that "the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965). Furthermore, "an interpretation [that] gives a reasonable meaning to all parts [of a contract] will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Northrop Grumman Corp. v. United States*, 50 Fed.Cl. 443, 459 (2001) (quoting *Arizona v. United States*, 216 Ct.Cl. 221, 235, 575 F.2d 855, 863 (1978)).

■ "When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation." *Flink/Vulcan v. United States*, No. 99–1005C, 63 Fed.Cl. 292, 298–99, 2004 WL 2955925 at *7, 2004 LEXIS 340 at *22 (Fed.Cl. Dec.14, 2004) (citing *Sea–Land Serv., Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978)). "Construction of an unambiguous writing, therefore, is an appropriate matter for summary judgment." *Id.* (citing *Martin v. United States*, 20 Cl.Ct. 738, 745 (1990); *Kelley v. United States*, 19 Cl.Ct. 155, 161 (1989)). " 'A contract provision is only ambiguous if susceptible to more than one reasonable meaning.' " *Barron Bancshares v. United States*, 366 F.3d 1360, 1375–76 (Fed. Cir.2004) (quoting *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir. 1986)). However, " '[t]o show an ambiguity, it is not enough that the parties differ in their respective interpretations of a contract term.' " *General Electric Co. v. United States*, 60 Fed.Cl. 782, 791 (2004) (quoting *King Fisher v. United States*, 51 Fed.Cl. 94, 99 (2001)).

### III. Cost–Sharing Provision Survives Termination for Convenience by the Government

■ The Government has the unique right to terminate a contract for convenience: "the Government may terminate performance of work under this contract in whole or, from time to time, in part, if the Contracting Officer determines that a termination is in the Government's interest ...." 48 C.F.R. § 52.249–6(a). Under a termination for convenience, "the contractor, instead of receiving compensation for governmental breach of contract based on classical measures of damages, is limited to recovery of 'costs incurred, profit on work done and the costs of preparing the termination settlement proposal.' " *Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed.Cir.1988) (citing R. NASH & J. CIBINIC, FEDERAL PROCUREMENT LAW 1104 (3d ed.1980)).

■ As discussed above, the Contract includes the Termination clause, found at FAR § 52.248–6 (Cost–Reimbursement). J.App. 96. That clause provides for the payment of "all costs *reimbursable under this contract*, not previously paid, for the performance of this contract, before the effective date of the termination." 48 C.F.R. § 52.249–6(g) (emphasis added). The Termination clause does not invalidate the cost-sharing provision of the Contract. Rather, it clearly seeks to fashion a remedy for the contractor *in conjunction with* the cost-sharing provisions. Thus, only those costs that would be reimbursed under the Contract will be paid to the contractor in the event of a termination for convenience. Here 80 percent of Jacobs's costs were reimbursable under the cost-sharing provision, B.007(S), J.App. 3, and therefore, under the termination for convenience clause, Jacobs is entitled to only 80 percent of its costs not previously paid.

Jacobs cites to the reference in the Termination clause to FAR Part 31 in support of its argument that the Court should apply equitable principles in determining the remedies for a termination for convenience. Pl. Mot. for Partial Summ. J. at 13 (citing 48 C.F.R. § 52.249–6(h) ("the cost principles and procedures in Part 31 of the [FAR] ... shall govern all costs claimed, agreed to, or determined under this clause")). The Termination clause's reference to FAR Part 31, however, bolsters the conclusion that remedies available to contractors under a termi-

nation for convenience clause are constrained by the terms of the contract. "Which costs are allowed is determined by the cost principles set forth in FAR part 31, 'subject to the general principle that the contractor should be compensated fairly for the work terminated.'" *White Buffalo Construction, Inc. v. United States,* 52 Fed.Cl. 1, 4 (2002) (quoting *Best Foam Fabricators, Inc. v. United States,* 38 Fed.Cl. 627, 638 (1997)). As a threshold matter, "[t]he factors to be considered in determining whether a cost is allowable include the following: (1) Reasonableness, (2) Allocability, (3) Standards promulgated by the CAS board if applicable, otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances, (4) *Terms of the contract,* (5) Any limitations set forth in this subpart." 48 C.F.R. § 31.201–2(a) (emphasis added). Again, the FAR contemplates that costs are recoverable only if the contract allows them. FAR Part 31, like the Termination clause itself, recognizes that a contractor cannot recover costs not contemplated by the contract.

Jacobs argues that interpreting the Cost–Sharing Arrangement clause to apply following a termination for convenience would render the Project Continuance clause superfluous. Jacobs reasons that if the Cost–Sharing Arrangement clause were to apply at any time, even after a termination for convenience, the Project Continuance clause would not be necessary. The Project Continuance clause, however, operated to establish that "continuance of the project is contingent upon the Contractor obtaining adequate cost sharing and upon the Contractor being granted an advanced patent waiver, satisfactory to the Contractor, by the DOE patent counsel." H.099(S), Project Continuance, J.App. 26. The Project Continuance clause goes on the establish that "[i]n the event that the Contractor elects to discontinue the project, the Contractor will be liable for 20 percent of the costs incurred during the performance period." *Id.* The Project Continuance clause was meant to govern the result of

a termination of the Contract by Jacobs at a certain time during performance. Because that contingency never occurred does not mean the clause was superfluous. It is also clear that the clause does not contradict the Cost–Sharing Arrangement clause. If anything, it reinforces the fact that Jacobs bears 20 percent of the project costs.

Jacobs also argues that the Government Property and Data clause contradicts the Termination clause because it illustrates that the application of the cost-sharing provision was contingent upon the completion of the Contract. Jacobs contends that the clause provides that Jacobs waived its right to be reimbursed for costs under the Contract and committed to the cost-sharing arrangement only upon Contract completion. Pl. Mot. for Partial Summ J. at 7. The Government Property and Data clause specifies that

> Upon completion of the contract, title to all the property acquired and/or furnished under the contract shall vest with the Government. The Contractor agrees to waive its right for reimbursement of their allowable percentage of cost participation for property acquired under this contract. In return, the Government releases the Contractor from all expenses relating to final disposition of the property, including dismantling and decommissioning and relieves the contractor from all environmental liabilities resulting from the transfer of the property to the Government . . . .

H.004b(1)(S), Government Property and Data (Jul 1985), J.App. at 13, 15.

Jacobs's inference is mistaken. The clause reinforces the fact that title to all the described property would vest with the Government upon completion of the project, and in return DOE would relieve Jacobs from disposition expenses and environmental liabilities associated with the property. Without the Government Property and Data clause, other provisions of the Contract, calling for an equitable distribution of project property if the Contract is terminated,[2] would create a

---

2. The other provisions include the Limitation of Funds clause, FAR § 52.232–22(k), D.App. 93 ("If this contract is terminated, the Government and the Contractor shall negotiate an equitable

distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each"), and the Limitation of Cost clause, FAR 52.232–20(h), D.App. 63 ("If

cloud on the DOE's title. Simply because the Government Property and Data clause governs vesting of title upon project completion does not mean that it contradicts the terms of the Termination clause and that the cost-sharing provision applies only if the Contract is completed.

Jacobs's arguments that equitable principles demand some other interpretation of the Contract have been considered and the Court has found those arguments to be unpersuasive.

## IV. Jacobs Is Not Entitled to Recover Fees Under the Termination Clause

■ As noted above, the Termination clause specified that the "provisions of this clause relating to fee are inapplicable if this contract does not include a fee." 48 C.F.R. § 52.249-6(m), J.App. 99. Clause I.020a, FAR § 52.216-12 Cost–Sharing Contract— No Fee, established that "[t]he Government shall not pay to the Contractor a fee for performing this contract." 48 C.F.R. § 52.216-12, D.App. 87. Jacobs argues that it is entitled to fees upon termination because the Government waived the no-fee provisions of the Contract by reimbursing Jacobs for 80 percent of its foregone fee. Pl. Opp at 12. The course of performance belies Jacobs's contention that the Government waived the no-fee provision.

DOE regulations specified that "fee or profit will not be paid the performer under a cost participation contract," but provided that "foregone fee or profit will be considered in establishing the degree of cost participation." DEAR § 917.7003(h), D.App. 99. As illustrated by the Statement of Cost in Jacobs's October 5, 1994 invoice to the DOE, D.App. 101–02, Jacobs included in the Government's 80 percent share of Contract costs its foregone fee, which the DOE approved for payment. The fees that Jacobs elected to forego were included in the costs charged to the DOE and, like all of the other Contract costs, the Government bore its 80 percent share.

this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution

Had the DOE elected to waive the no-fee provisions of the Contract, it would have paid Jacobs 100 percent of the amount it claimed as a fee. Instead, the DOE simply paid its share of the Contract costs in accordance with the Cost–Sharing Arrangement clause, which included a portion of the fee foregone by Jacobs. There was no waiver of the no-fee provisions of the Contract and, to the extent Jacobs was allowed to collect fees that it had foregone in order to participate in the Contract, it has already collected them from the Government. *See* Contracting Officer's Final Decision, J.App. 167.

## CONCLUSION

For the reasons set forth above, Jacobs's Motion for Summary Judgment is DENIED and the Government's Cross–Motion for Summary Judgment is GRANTED.

The Clerk of the Court is directed to enter judgment for defendant pursuant to RCFC 56(a).

IT IS SO ORDERED.